**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| HARBOR COMPLIANCE LLC,<br><br>Plaintiff,<br><br>vs.<br><br>ASHLEY GREENE,<br>KRISTI MCDONOUGH, and<br>LEGACY SEARCH & FILE LLC,<br><br>Defendants. | CIVIL ACTION NO. ____________<br><br>**JURY TRIAL DEMANDED** |

**CIVIL ACTION COMPLAINT**

Plaintiff, Harbor Compliance LLC ("Harbor Compliance" or the "Company"), by and through its undersigned attorneys, Royer Cooper Cohen Braunfeld LLC, hereby files the following Civil Action Complaint against Defendants, Ashley Greene ("Greene"), Kristi McDonough ("McDonough"), and Legacy Search & File LLC ("Legacy") (collectively, "Defendants"), and avers as follows:

**PRELIMINARY STATEMENT**

1. "[W]e just keep everything personal . . . then when we go, we delete it all." That is how Defendant Greene described the plan to her co-worker, Defendant McDonough, over Harbor Compliance's own SLACK platform, just minutes after McDonough announced that she was going to "delete my UCC spread sheet so Jo loses access to it." Greene's very next message: *"ok totally confidential k??"*

2. It was not idle talk. Over the next three months, Greene and McDonough did exactly what they said they would do: they copied Harbor Compliance's confidential information

and trade secrets to their personal accounts and devices, wiped them from the Company's systems, and walked out the door to compete.

3. Harbor Compliance had just recently acquired National Document (defined below), the business Greene and McDonough came from, and its customer data was the core of what Harbor Compliance paid for. And Greene and McDonough took it in breach of written promises, as well as Harbor Compliance's statutory and common law rights.

4. Before starting work at Harbor Compliance, both Greene and McDonough signed non-disclosure agreements acknowledging that their positions were "one of trust and confidence" and agreeing not to use the Company's confidential information for their own benefit.

5. Yet, while still on Harbor Compliance's payroll, Greene wrongfully downloaded handfuls of Company files.

6. For her part, McDonough sent a "test" e-mail to her personal Gmail account and, once she knew the route worked, used it to send herself Harbor Compliance customer documents, and used Harbor Compliance's resources to create competitive Uniform Commercial Code ("UCC") strategy plans for Legacy.

7. Then, on her last day, in the span of about two and a half minutes, McDonough permanently deleted 139 Company files from Harbor Compliance's systems.

8. On September 24, 2026, Greene and McDonough gave one day's notice. On September 25, 2026, their last day of employment, they formed Legacy, a directly competitive business (and their communications via Harbor Compliance's SLACK application show that they were taking active steps to compete for months prior).

9. Defendants have since confirmed their theft themselves.

10. Confronted with cease and desist letters from Harbor Compliance's counsel, they identified dozens of documents they took/retained and returned Company files that they had kept after their abrupt departure (collectively, the "Retained Files"), including a detailed compilation of Harbor Compliance's customer and entity names, account and file numbers, contact names and e-mail addresses, pricing, renewal dates, and internal account notes (the "Customer Spreadsheet").

11. The Customer Spreadsheet is a ready-made roadmap for poaching Harbor Compliance's customers, including, in particular, those which were personally serviced by Greene and McDonough during their tenures with both National Document and Harbor Compliance.

12. Accordingly, to protect its legitimate business interests and prevent any further irreparable harm, Harbor Compliance comes to this Honorable Court seeking permanent injunctive relief and monetary damages pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*. (the "DTSA"), and the Pennsylvania Uniform Trade Secrets Act, 12 Pa.C.S. § 5301, *et seq*. (the "PUTSA"), as well as Pennsylvania common law.

## THE PARTIES

13. Harbor Compliance is a Delaware limited liability company with its principal place of business located at 812 North Prince Street, Lancaster, PA 17603.

14. Greene is an adult individual residing at 13744 West Solano Drive, Litchfield Park, AZ 85340.

15. McDonough is an adult individual residing at 16060 West Maricopa Street, Goodyear, AZ 85338.

16. Legacy is an Arizona limited liability company with a principal address of 13744 West Solano Drive, Litchfield Park, AZ 85340, which is Greene's residence.

17. Upon information and belief, Legacy's members are Greene, McDonough, and Greene's husband, Domine Greene.

**JURISDICTION AND VENUE**

18. This Court maintains subject matter jurisdiction over the instant action pursuant to 28 U.S.C. § 1331 because Harbor Compliance asserts a cause of action against Defendants under the DTSA, a federal statute, and the Court maintains supplemental jurisdiction over Harbor Compliance's Pennsylvania state law claims pursuant to 28 U.S.C. § 1367(a).

19. This Court has personal jurisdiction over Defendants under Pennsylvania's long-arm statute, 42 Pa.C.S. § 5322(a)(4) and (b), because Defendants purposefully directed their conduct at Pennsylvania, caused harm in Pennsylvania, and Harbor Compliance's claims arise directly from that conduct. *See International Shoe Co. v. State of Washington*, 326 U.S. 310, 316 (1945).

20. Legacy, which Greene and McDonough own, holds itself out to the public as providing UCC search, filing, and lien services that directly compete with Harbor Compliance's services across the country, including in the Commonwealth of Pennsylvania.

21. To that end, Legacy's own website states that it is "[b]ased in Arizona, *with search and filing coverage across all 50 states*." [1]

22. By advertising coverage in all fifty states, Legacy represents that it performs, and offers to perform, searches and filings with Pennsylvania filing offices on behalf of its customers.

23. Legacy's Pennsylvania-directed services are the very services for which Defendants misappropriated Harbor Compliance's Customer Spreadsheet and other Trade Secrets (as defined below), such that Harbor Compliance's claims arise out of and relate to Legacy's

[1] *See* https://legacysearchfile.com/

contacts with Pennsylvania. Jurisdiction is independently proper under the *Calder* "effects" test because: (i) misappropriation of trade secrets, as well as breach of contract, breach of and aiding and abetting the duty of loyalty, civil conspiracy, and unfair competition are intentional torts; (ii) Harbor Compliance felt the brunt of the harm in Pennsylvania, where it is headquartered and where its trade secrets were formulated, further developed, and reside; and (iii) Defendants expressly aimed their conduct at Pennsylvania by taking Company-wide confidential information and trade secrets maintained on Harbor Compliance's Pennsylvania-based systems (information not limited to any Arizona market) knowing Harbor Compliance (and as they specifically said to each other via SLACK, their Pennsylvania-based supervisor) would suffer the resulting harm in Pennsylvania. *See Calder v. Jones*, 465 U.S. 783 (1984); *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 265–66 (3d Cir. 1998); *Gov't Emps. Ins. Co. v. Nealey*, 262 F. Supp. 3d 153, 166 (E.D. Pa. 2017); *Vizant Techs., LLC v. Whitchurch*, 97 F. Supp. 3d 618, 631–32 (E.D. Pa. 2015); *M3 USA Corp. v. Hart*, 516 F. Supp. 3d 476, 497–98 (E.D. Pa. 2021); *Xcoal Energy & Res. v. Asanome*, 2025 WL 949510, at *9 (W.D. Pa. Mar. 28, 2025).

24. Legacy was formed and is controlled by Greene and McDonough, and it is subject to personal jurisdiction in Pennsylvania for the same conduct, which Greene and McDonough undertook to launch and operate Legacy's competing business and which was the recipient and beneficiary of the confidential information and trade secrets taken.

25. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Harbor Compliance's claims occurred here: Defendants' employment with, supervision by, and tortious conduct directed at, Harbor Compliance, which is headquartered in Lancaster County, including Defendants' taking and

deletion of files maintained on Harbor Compliance's Pennsylvania-based servers and systems, and the resulting harm to Harbor Compliance and its trade secrets, which reside in this Judicial District.

## FACTUAL BACKGROUND

### A. Harbor Compliance's Business and Its Acquisition of National Document.

26. Harbor Compliance is a leading provider of compliance solutions for organizations of all types and sizes, and provides charitable solicitation registration and renewal, fundraiser registration, corporate registration, registered agent, registration for cause marketing, business formation and document filing, annual reporting, foreign qualification, tax registration, and UCC search and filing services (collectively, the "Services") to businesses and law firms throughout the United States.

27. Founded by a team of regulatory specialists and technology trailblazers, to date, Harbor Compliance has helped more than 40,000 clients apply for, secure, and maintain entity, licensing, and tax compliance solutions across all industries.

28. The Services sold by Harbor Compliance are not subject to public bidding, and instead, it is necessary for Harbor Compliance to rely upon targeted pricing and the customer relationships that it has spent substantial amounts of time and resources to develop and maintain over the years to have any success in the marketplace, which is highly competitive.

29. Harbor Compliance does not publish its pricing or fee arrangements, which are negotiated with and communicated to each customer on an individual, confidential basis.

30. In or around November 2025, Harbor Compliance acquired National Document, LLC ("National Document"), an Arizona-based document search and filing business, to expand its UCC search and filing Services, paying substantial consideration for National Document's business, including its customer data, reference compilations, UCC filing records, and goodwill.

31. Upon closing, National Document's files, customer relationships, and goodwill became the property of Harbor Compliance, which, as noted above, is based in Pennsylvania.

32. The core of what Harbor Compliance paid for was National Document's comprehensive customer data, together with its reference compilations and UCC filing records, which National Document had built over years of servicing its customers and which are not available from any public source in compiled form.

33. Although National Document was based in Arizona, after the acquisition Harbor Compliance, a Pennsylvania business, continued to develop and build on the acquired trade secrets at its own time and expense, investing substantial resources in doing so.

34. Harbor Compliance, both on its own and through the prior work of National Document that it acquired for significant consideration, has spent years and substantial sums developing, principally from its Pennsylvania headquarters, valuable confidential and proprietary information, including: (A) compilations of: (i) customer identities and contact information; (ii) account histories; (iii) pricing and fee arrangements; (iv) renewal due dates; (B) compilations of reference materials and data for completing and filing UCC work; and (C) confidential analyses of customer demands and needs (collectively, the "Trade Secrets").

35. Harbor Compliance integrated the materials it acquired from National Document into its own information technology servers and systems based in Pennsylvania, where they now reside alongside the Company's Trade Secrets.

36. The Trade Secrets derive independent economic value from not being generally known to, or readily ascertainable through proper means by, Harbor Compliance's competitors.

37. No competitor possesses the same compilations of customer identities, contact information, filing histories, renewal timing, and UCC search and filing references, and that combination gives Harbor Compliance its competitive edge in the UCC search and filing market.

38. By way of example, a competitor in possession of the Customer Spreadsheet would know exactly which entities to target, whom to contact, what they pay, and when their renewals come due, which is information that took Harbor Compliance substantial time and money to compile.

39. In other words, the Customer Spreadsheet would provide a competitor (i.e., Legacy) with the "head-start" needed to unfairly compete with Harbor Compliance in the marketplace.

**B. Greene and McDonough Join Harbor Compliance and Agree to Protect Its Confidential Information and Trade Secrets.**

40. Greene and McDonough were two of the three National Document employees who joined Harbor Compliance following the acquisition.

41. Both Greene and McDonough commenced employment with Harbor Compliance on December 1, 2025, with Greene as a Partner Fulfillment Specialist and McDonough as a Registered Agent Fulfillment Specialist.

42. Neither role required Greene or McDonough to download Company files in bulk, store Company files on a local or personal device, send Company documents to a personal e-mail account, or delete Company files from Harbor Compliance's systems. As described below, Harbor Compliance's written policies expressly prohibited that conduct.

43. Although Greene and McDonough worked out of National Document's former office in Phoenix, Arizona, they did not report to any supervisor on-site.

44. Rather, Greene and McDonough reported to Harbor Compliance's Pennsylvania-based management throughout their employment, including their direct supervisor, Jo Johnston

Diaz, the Company's then-Chief of Staff, who supervised their work from Pennsylvania, and thereafter two subsequent supervisors, each of whom was likewise based in, and supervised their work from, Pennsylvania.

45. Greene and McDonough performed their work on, and accessed the Trade Secrets through, Harbor Compliance's information technology servers and systems, which are based and maintained in Pennsylvania.

46. Because their roles gave them access to the Trade Secrets, Harbor Compliance required Greene and McDonough to protect them.

47. On November 26, 2025, in exchange for their employment and access to the Trade Secrets, Greene and McDonough each executed a Non-Disclosure, Non-Solicitation, and Assignment of Inventions Agreement (each, an "Agreement," and together, the "Agreements"), true and correct copies of which are attached as **Exhibits A** and **B**, respectively.

48. In the Agreements, Greene and McDonough each acknowledged that "his/her position with Employer is one of trust and confidence" and that "there is independent economic value in not having Employer's Confidential Information disclosed to others in the industry." (Exs. A–B § 2).

49. The Agreements define "Confidential Information" to include "any information or compilation of information that Employee may receive from Employer . . . which is generally not known," expressly including "trade secrets" and "information regarding the Employer's customers." (*Id.* § 1(a)).

50. "Confidential Information" also includes "information conceived, originated, discovered, or developed in whole or in part by Employee as a consequence of or through employment with Employer." (*Id.* § 1(a)).

51. Greene and McDonough agreed "not to directly or indirectly use, divulge or disclose Confidential Information . . . for Employee's own benefit or for the benefit of any person other than Employer, either during or after Employee's employment." (*Id.* § 2).

52. Greene and McDonough agreed that their confidentiality obligations "are unconditional" and survive termination. (*Id.* §§ 2(b), 10).

53. They further agreed that any breach "will cause irreparable harm to Employer for which there is no adequate remedy at law," that Harbor Compliance may obtain an injunction "without bond or surety" (*Id.* § 9), and that they will pay Harbor Compliance's attorneys' fees and costs incurred in enforcing the Agreements (*Id.* § 13).

54. The Agreements also provide that they are governed by Pennsylvania law, confirming that, when they signed, Greene and McDonough knew and understood that they were going to work for a Pennsylvania company and that their obligations to it would be governed by the law of Pennsylvania.

55. Greene and McDonough also acknowledged receipt of Harbor Compliance's Employee Handbook - first the 2025 version on November 26, 2025, and then the 2026 version (which was in effect when they resigned) on February 20, 2026. Greene's and McDonough's signed acknowledgments are attached as **Exhibits C** and **D**, respectively.

56. The Employee Handbook's Code of Conduct requires that "client lists" and "marketing or business strategies/plans" be "treated with discretion and only disseminated on a need-to-know basis," and that employees act "at all times consistent with their duty of loyalty to Harbor Compliance."

57. Greene and McDonough were likewise bound by, and acknowledged receipt of, Harbor Compliance's IT Policy Handbook, including its Acceptable Use Policy, which expressly

provides that "[p]ersonnel must not save Harbor Compliance data to any personal device"; that "[n]o confidential information shall be sent from [sic] to an individual or entity outside of Harbor Compliance using personal email accounts"; and that "[d]issemination of confidential or protected information (i.e., trade secrets, . . . customer information, etc.)" is prohibited except for approved business purposes. Relevant portions of Harbor Compliance's IT Policy Handbook are attached as **Exhibit E**.

58. The IT Policy Handbook's Data Classification Policy likewise classifies "customer data" as Confidential Data and "intellectual property" as Restricted Data.

59. Harbor Compliance also restricts system access on a least-privilege basis, requires multi-factor authentication for company e-mail and cloud infrastructure, monitors and logs system activity, and revokes access upon resignation or termination.

60. By implementing and enforcing the written policies outlined above, along with restricting access to its Trade Secrets by using password-protected electronic systems, networks, and e-mail servers, Harbor Compliance took and takes reasonable steps to safeguard and ensure that its Trade Secrets were and are held in the strictest of confidence by its employees.

61. Indeed, Harbor Compliance has invested and continues to invest significant amounts of time (since 2012) and millions of dollars to develop and keep its Trade Secrets up to date, allowing it to maintain a competitive edge in the marketplace.

62. And, if a competitor were to know Harbor Compliance's Trade Secrets, it would have a substantial unfair advantage over Harbor Compliance in the marketplace.

### C. **Defendants' Scheme to Take Harbor Compliance's Confidential Information and Trade Secrets and Unfairly Compete.**

63. It did not take long for Greene and McDonough to turn on their new employer.

64. Harbor Compliance's forensic review of its own SLACK, Google Drive, and Gmail records tells the story in Greene and McDonough's own words: while still on the Company's payroll, Greene and McDonough decided to leave Harbor Compliance, decided to take its Trade Secrets with them, and spent the summer of 2026 preparing to wipe key documents from the Company's systems while keeping copies for themselves to launch a competing business.

65. As early as April 20, 2026, McDonough told Greene via SLACK that she needed to "go delete all the RA stuff I made out of my personal drive," adding that she "dont want or need it anymore," to which Greene responded, "nope," an admission that she had been keeping Harbor Compliance's registered agent materials in a personal account, in direct violation of Company policy.

66. Those materials, developed by McDonough in the course of her employment – and in exchange for being paid salary and benefits by Harbor Compliance – are Confidential Information under the Agreements. (Exs. A-B § 1(a)).

67. Over the following weeks, McDonough built out a Harbor Compliance Google Drive spreadsheet titled "#UCC Filings," editing it approximately 118 times between May 14 and June 10, 2026.

68. On June 1, 2026, McDonough shared the #UCC Filings spreadsheet with Greene's Harbor Compliance account.

69. Then, on the afternoon of June 12, 2026, McDonough decided to remove the #UCC Filings spreadsheet from Harbor Compliance's systems altogether.

70. That afternoon, Greene pasted into her SLACK conversation with McDonough a message from Jo Johnston Diaz (her Pennsylvania-based superior) explaining that the Company could now "track the volume and the time" of its UCC work and was "likely to bring on some

additional UCC volume as we acquire more companies," confirming that Defendants knew the UCC line of work was central to Harbor Compliance's growth plans.

71. At 3:09 p.m. that day, McDonough told Greene: "Well, good luck to them. I am one foot out the door."

72. **Two minutes later, McDonough announced her plan: "im goign [sic] to go delete my UCC spread sheet so Jo loses access to it."**

73. **Her reason for doing so was clear, following up her message with "like for real *eff her*."**

74. As Greene and McDonough well knew, Jo Johnston Diaz was their superior (and Harbor Compliance's then-Chief of Staff), based in Pennsylvania, and relied on access to the #UCC Filings spreadsheet to oversee their UCC work from Harbor Compliance's headquarters; by deleting it, McDonough deliberately sought to prevent her from doing her job in Pennsylvania.

75. McDonough wasted no time in doing so.

76. At 3:19 p.m., Harbor Compliance's Google Drive logs show McDonough moving the #UCC Filings spreadsheet to the system's "trash" bin.

77. Seconds later, she permanently deleted it.

78. Moments after that, Greene and McDonough had the following exchange over Harbor Compliance's SLACK platform:

> **McDonough:** "i just deleted the UCC spreadsheet"
> **Greene**: *"Kristi. Put it in the personal gmail"*
> **McDonough**: "oh i did" / "but i deleted it out of Harbor"
> **Greene**: *"oh thank god. i was going to crap my pants*"
> **McDonough**: "i will share it with you"
> **Greene:** *"personal" / "we just keep everything personal." / "then when we go, we delete it all"*

**McDonough**: "ash.gr33n3" / "righ[t]"
**Greene:** *"ok totally confidential k??"*
**McDonough**: "yeah"

(emphasis added).

79. Notably, "ash.gr33n3" is the prefix of Greene's personal Gmail address (ash.gr33n3@gmail.com).

80. Greene's reaction to learning that McDonough had kept a personal copy of the #UCC Filings spreadsheet before deleting the Company's copy ("oh thank god. i was going to crap my pants"), confirms that her concern was never that Harbor Compliance had lost its spreadsheet, only that Defendants might lose theirs.

81. In a single conversation, on Harbor Compliance's own systems, Greene and McDonough admitted in writing that they had: (i) copied the spreadsheet to a personal account; (ii) erased it from the Company's systems so that no one else at Harbor Compliance could access it; and (iii) settled on a plan going forward: keep everything "personal," and, when they left, "delete it all."

82. Greene's closing instruction ("ok totally confidential k??") confirms that Defendants knew exactly what they were doing, and that they tried (unsuccessfully) to hide it from Harbor Compliance.

83. Over the course of the summer, Greene and McDonough's plan to leave Harbor Compliance and compete against it took shape.

84. On July 16, 2026, McDonough relayed to Greene that a friend had urged that "you and ashley should start you [sic] own company."

85. On July 29, 2026, McDonough set the timeline: "I feel like we are working the month of August and then we will be quitting after our evaluations at the beginning of sept."

86. With their departure date set, Greene and McDonough turned to taking as much as they could, downloading handfuls of Harbor Compliance documents to their personal drives.

87. The timing of these downloads points to only one explanation: Greene was stockpiling Harbor Compliance's files to take with her.

88. Meanwhile, McDonough opened a direct pipeline from Harbor Compliance's systems to her personal e-mail account.

89. On August 14, 2026, McDonough sent a "test" message from her Company e-mail account to her personal Gmail account at kristilynnmcd@gmail.com.

90. Once she confirmed that the route worked, McDonough used it, forwarding Harbor Compliance customer UCC documents to herself that same afternoon.

91. Four days later, on August 18, 2026, McDonough went further, e-mailing herself, from kmcdonough@harborcompliance.com to kristilynnmcd@gmail.com, under the subject line "UCC Info,"" – two spreadsheets that Greene and McDonough created, using Company resources, for their competitive business, Legacy.

92. The next day, Greene joined in, forwarding a Harbor Compliance customer's UCC-3 amendment to McDonough's personal Gmail account.

93. Neither Greene nor McDonough had any business reason to send Company customer documents to a personal Gmail account, which Harbor Compliance's IT Policy Handbook expressly forbids.

94. They did so for one reason: to keep those materials after they left.

95. Greene and McDonough did not just take Harbor Compliance's files; they deleted them, cutting the Company off from its own work product while keeping that work product for themselves.

96. On August 27 and August 31, 2026, Greene moved 351 and 478 Company items, respectively, to the "trash."

97. By mid-September 2026, Greene briefly grew concerned about the digital trail she had left behind.

98. On September 17, 2026, recognizing that Harbor Compliance was monitoring activity on its systems, Greene wrote to McDonough: "I use my personal google to work because all the passwords are saved right? but now today im like no remove them, they went through everything."

99. Minutes later, she added: "somethign [sic] tells me, things are not okay," and "I took my personal off of here, I am not risking it any further."

100. In the same conversation, Greene and McDonough cast themselves as the victims.

101. Greene complained that Harbor Compliance was "watching everything. and taking EVERYTHING," and that "I feel violated."

102. McDonough agreed: "it is violating," and Greene responded: "yeah, and A LAWSUIT WAITING TO HAPPEN."

103. When McDonough added that "being watched like a child or criminal is not a good feeling," Greene declared: "violating me? i will fight you, to the death."

104. The irony is unmistakable. Greene and McDonough were not the ones being violated; they were the ones violating Harbor Compliance's systems by copying its files to personal accounts and devices and deleting them from the Company's systems, in breach of the Agreements and the Company's written policies.

105. Harbor Compliance's review of activity on its own systems was not a "violation" of anyone; it was precisely the type of reasonable measure the Company takes to protect its Trade Secrets, and it is what ultimately exposed Defendants' scheme.

106. It still did not stop them, because that very same day, Greene moved another 526 files to the "trash."

107. Throughout, Greene and McDonough worked to keep their communications out of Harbor Compliance's view, repeatedly moving their conversations off Company systems with instructions to "text me."

108. Then, on September 24, 2026, with Harbor Compliance's files in hand, Greene and McDonough gave notice of their resignations, to be effective the very next day.

109. On their last day, September 25, 2026, Greene and McDonough carried out the final step of the plan they had laid out in June: "when we go, we delete it all."

110. **That evening, McDonough wrote: "i just deleted all my documents for the run n stuff, they dont need those."**

111. In approximately two and a half minutes, between 7:27 and 7:29 p.m., McDonough permanently deleted 139 Company files, including the "UCC Manual & Upload System," a "CSR Backup," a Due Diligence Training Manual, and recordings and notes of her one-on-one meetings with management.

112. That same day, Greene and McDonough formed Legacy, as shown by its Articles of Organization, a true and correct copy of which is attached as **Exhibit F**.

113. The sequence was deliberate: take the files, destroy Harbor Compliance's copies, and open a competing business the same day – although Greene and McDonough had been taking

Harbor Compliance's Confidential Information and Trade Secrets for Legacy all along, as they did not just suddenly decide to form a business (as confirmed by their own written messages).

114. In one stroke, Greene and McDonough hobbled Harbor Compliance and launched Legacy on the strength of Harbor Compliance's own work, skipping the years of time and investment it took Harbor Compliance to build in the first place.

**D. <u>Harbor Compliance's Cease & Desist Letters, Defendants' Return of the Retained Files, and Defendants' Refusal to Stand Down.</u>**

115. Harbor Compliance, learning of Defendants' obvious misconduct, moved quickly.

116. On October 8, 2026, Harbor Compliance's legal counsel sent cease and desist letters to Greene and McDonough, with copies to Legacy (collectively, the "Cease & Desist Letters"), true and correct copies of which are attached as **<u>Exhibits G</u>** and **<u>H</u>**.

117. In the Cease & Desist Letters, Harbor Compliance demanded that Defendants: (i) immediately cease any use and/or disclosure of the Company's confidential information and Trade Secrets; (ii) preserve all relevant evidence; and (iii) execute declarations confirming, among other things, that they had returned any and all Company files and materials and would honor their obligations under the Agreements (the "Declarations").

118. On October 15, 2026, Greene and McDonough, through counsel, refused to confirm key portions of the Declarations, including those addressing non-solicitation and Confidential Information, and they have not signed the Declarations (or any version of a declaration) to date.

119. Instead, by letter dated October 21, 2026, Defendants' counsel insisted that the materials Greene and McDonough had kept were not confidential and offered to produce them along with an index, while offering unconvincing after-the-fact excuses for their misconduct.

120. On October 23, 2026, Harbor Compliance rejected those explanations, reiterated that Greene and McDonough were at all times bound by the Company's written policies

prohibiting the storage of Company files on personal devices and accounts, and made clear that any files they retained belonged to Harbor Compliance.

121. On October 28, 2026, more than a month after their resignations, Defendants returned a first set of Retained Files, followed by a second set on or about October 29, 2026.

122. Their own production proved that the materials were confidential: among the first set of Retained Files was the Customer Spreadsheet.

123. The Customer Spreadsheet is a detailed compilation of Harbor Compliance's customer information, including: (i) customer and entity names; (ii) state file numbers; (iii) internal account numbers; (iv) fee amounts; (v) formation and renewal dates; (vi) invoice references; (vii) customer contact names and e-mail addresses; (viii) Harbor Compliance portal account links; (ix) account-handling status; and (x) internal handling notes.

124. In short, the Customer Spreadsheet contains precisely the information that a competitor would need to identify, target, and undercut Harbor Compliance's customers at renewal, none of which is publicly available or could be recreated from public sources without substantial time and effort.

125. Harbor Compliance then gave Defendants a simple opportunity to demonstrate their good faith: on October 29, 2026, it asked them to confirm in writing, by 12:00 p.m. on October 30, 2026, that they had not solicited or accepted, and for two years would not solicit or accept, business from the customers and entities identified in the Customer Spreadsheet.

126. Defendants did not provide that assurance, which speaks volumes.

127. Their continued access to the Trade Secrets – which they copied to personal accounts and devices, combined with their refusal to disavow any use of the Customer

Spreadsheet, threatens Harbor Compliance with ongoing, irreparable harm, including the loss of customers, goodwill, and its competitive position, for which there is no adequate remedy at law.

128. That harm is all the more severe because Harbor Compliance paid substantial consideration to acquire National Document's customer data, reference compilations, UCC filing records, and goodwill, and Greene and McDonough, two of the very employees who came over in that acquisition, took that information, among other things, to divert those same customers to Legacy, depriving Harbor Compliance of the benefit of its bargain.

129. Although Harbor Compliance's investigation remains ongoing, the full extent of Defendants' use and disclosure of the Trade Secrets is presently unknown and lies uniquely within Defendants' knowledge.

**COUNT I**
**DEFEND TRADE SECRETS ACT**
***(Harbor Compliance v. Defendants)***

130. Harbor Compliance incorporates the foregoing Paragraphs of this Complaint as though set forth at length herein.

131. The DTSA broadly defines the term "trade secret" to include all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing, where: (a) the owner thereof has taken reasonable measures to keep such information secret; and (b) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

132. Pertinent to this case, Harbor Compliance's Trade Secrets are comprised of, *inter alia*: (A) compilations of: (i) customer identities and contact information; (ii) account histories; (iii) pricing and fee arrangements; (iv) renewal due dates; (B) compilations of reference materials and data for completing and filing UCC work; and (C) confidential analyses of customer demands and needs constitute "trade secrets" within the meaning of that term under the DTSA.

133. These trade secrets would be difficult, expensive, and time-consuming to duplicate independently, if they could be at all.

134. These trade secrets are owned by and the exclusive property of Harbor Compliance, have been maintained in secrecy by Harbor Compliance, are not known to the public or within Harbor Compliance's industry, and are of great pecuniary value to Harbor Compliance.

135. Harbor Compliance entrusted its Trade Secrets to Greene and McDonough, subject to the Agreements and its written policies, for the exclusive purpose of benefitting Harbor Compliance.

136. Harbor Compliance derives independent economic value from its Trade Secrets not being generally known or readily ascertainable by proper means to third parties that could obtain economic value from the use of Harbor Compliance's Trade Secrets.

137. Greene and McDonough had a duty, under the Agreements, Harbor Compliance's written policies, and applicable law, to refrain from misusing or misappropriating the Trade Secrets entrusted to them.

138. Greene and McDonough breached that duty by intentionally, knowingly, and by wrongful and improper means, including by forwarding Company files to their personal Gmail accounts, improperly downloading Company files and syncing them to a local device, and

retaining the Retained Files after their resignations, misappropriating the Trade Secrets for their own benefit and the benefit of Legacy.

139. Legacy, through Greene and McDonough, its founders and members, acquired the Trade Secrets knowing, or having reason to know, that they were acquired by improper means, and has used and/or threatens to use them to compete with Harbor Compliance.

140. The DTSA expressly authorizes this Court to enjoin Defendants from any actual or threatened misappropriation of Harbor Compliance's Trade Secrets.

141. As a direct and proximate result of Defendants' misappropriation of Harbor Compliance's Trade Secrets, Harbor Compliance has suffered, and continues to suffer, immediate irreparable injury, for which Harbor Compliance has no adequate remedy at law.

142. In addition to the irreparable injury described above, as a direct and proximate result of Defendants' wrongful conduct, Harbor Compliance has suffered and/or will suffer actual and/or consequential damages, including loss of competitive business advantage, opportunity, and/or expectancy.

143. Defendants' misappropriation was willful and malicious, and, as a result, Harbor Compliance is entitled to exemplary damages and its reasonable attorneys' fees under the DTSA. *See* 18 U.S.C. § 1836(b)(3)(C)–(D).

144. Furthermore, unless Defendants are enjoined from further using and/or disclosing Harbor Compliance's Trade Secrets, the value of a substantial part of Harbor Compliance's business will be irreparably harmed.

## COUNT II
## PENNSYLVANIA UNIFORM TRADE SECRETS ACT
***(Harbor Compliance v. Defendants)***

145. Harbor Compliance incorporates the foregoing Paragraphs of this Complaint as though set forth at length herein.

146. The PUTSA defines the term "trade secret" in substantially the same manner as under the DTSA.

147. Pertinent to this case, Harbor Compliance's Trade Secrets are comprised of, *inter alia*: (A) compilations of: (i) customer identities and contact information; (ii) account histories; (iii) pricing and fee arrangements; (iv) renewal due dates; (B) compilations of reference materials and data for completing and filing UCC work; and (C) confidential analyses of customer demands and needs constitute "trade secrets" within the meaning of that term under the PUTSA.

148. These trade secrets would be difficult, expensive, and time-consuming to duplicate independently, if they could be at all.

149. These trade secrets are owned by and the exclusive property of Harbor Compliance, have been maintained in secrecy by Harbor Compliance, are not known to the public or within Harbor Compliance's industry, and are of great pecuniary value to Harbor Compliance.

150. Harbor Compliance entrusted its Trade Secrets to Greene and McDonough, subject to the Agreements and its written policies, for the exclusive purpose of benefitting Harbor Compliance.

151. Harbor Compliance derives independent economic value from its Trade Secrets not being generally known or readily ascertainable by proper means to third parties that could obtain economic value from the use of Harbor Compliance's Trade Secrets.

152. Greene and McDonough had a duty, under the Agreements, Harbor Compliance's written policies, and applicable law, to refrain from misusing or misappropriating the Trade Secrets entrusted to them.

153. Greene and McDonough breached that duty by intentionally, knowingly, and by wrongful and improper means, including by forwarding Company files to their personal Gmail accounts, improperly downloading Company files and syncing them to a local device, and retaining the Retained Files after their resignations, misappropriating the Trade Secrets for their own benefit and the benefit of Legacy.

154. Legacy, through Greene and McDonough, its founders and members, acquired the Trade Secrets knowing, or having reason to know, that they were acquired by improper means, and has used and/or threatens to use them to compete with Harbor Compliance.

155. The PUTSA expressly authorizes this Court to enjoin Defendants from any actual or threatened misappropriation of Harbor Compliance's Trade Secrets.

156. As a direct and proximate result of Defendants' misappropriation of Harbor Compliance's Trade Secrets, Harbor Compliance has suffered, and continues to suffer, immediate irreparable injury, for which Harbor Compliance has no adequate remedy at law.

157. In addition to the irreparable injury described above, as a direct and proximate result of Defendants' wrongful conduct, Harbor Compliance has suffered and/or will suffer actual and/or consequential damages, including loss of competitive business advantage, opportunity, and/or expectancy.

158. Defendants' misappropriation was willful and malicious, and, as a result, Harbor Compliance is entitled to exemplary damages and its reasonable attorneys' fees under the PUTSA. *See* 12 Pa.C.S. §§ 5304(b), 5305.

159. Furthermore, unless Defendants are enjoined from further using and/or disclosing Harbor Compliance's Trade Secrets, the value of a substantial part of Harbor Compliance's business will be irreparably harmed.

160. And, pursuant to 12 Pa.C.S. § 5303(a), Harbor Compliance is entitled to injunctive relief to prevent the actual and threatened misappropriation of its Trade Secrets based upon: (i) Defendants' documented plan to keep Company information "personal" and, when they left, "delete it all"; (ii) their transfer of Company files to personal accounts and devices; and (iii) their operation of a directly competing business, Legacy, while refusing to disavow any use of the Customer Spreadsheet.

## COUNT III
## BREACH OF THE DUTY OF LOYALTY
***(Harbor Compliance v. Greene and McDonough)***

161. Harbor Compliance incorporates the foregoing Paragraphs of this Complaint as though set forth at length herein.

162. As employees of Harbor Compliance, Greene and McDonough owed the Company a duty of loyalty, which required them to act solely for Harbor Compliance's benefit in all matters connected with their employment, and prohibited them from acting against its interests while still employed.

163. Greene and McDonough expressly acknowledged that duty: the Agreements confirm that their positions were "one of trust and confidence" (Exs. A–B § 2), and the Code of Conduct requires employees to act "at all times consistent with their duty of loyalty to Harbor Compliance."

164. Greene and McDonough breached their duty of loyalty while still on Harbor Compliance's payroll by, *inter alia*: (i) using Company time and resources to create UCC strategy

spreadsheets for Legacy; (ii) forwarding Company files, including customer UCC documents, to their personal Gmail accounts; (iii) improperly downloading Company files and syncing them to a local device; (iv) deleting the #UCC Filings spreadsheet "so Jo loses access to it"; (v) moving more than 1,300 Company files to the "trash"; (vi) permanently deleting Company files on their last day; and (vii) concealing their conduct by moving their communications off Company systems, all to benefit their competing business, Legacy.

165. Greene's and McDonough's conduct went far beyond mere preparation to compete; they used their positions of trust to take and destroy Harbor Compliance's property while still employed by the Company.

166. As a direct and proximate result of Greene's and McDonough's breaches, Harbor Compliance has suffered, and continues to suffer, damages, including the loss of its files and work product, the costs of investigating and remediating Defendants' misconduct, and the compensation it paid to Greene and McDonough during the period of their disloyalty.

167. Greene's and McDonough's conduct was willful, outrageous, undertaken with reckless indifference to the rights of Harbor Compliance, in bad faith, and with the intent to harm Harbor Compliance, entitling Harbor Compliance to punitive damages.

## COUNT IV
## UNFAIR COMPETITION
***(Harbor Compliance v. Defendants)***

168. Harbor Compliance incorporates the foregoing Paragraphs of this Complaint as though set forth at length herein.

169. As set forth above, despite having no authority to do so, Defendants took and retained Harbor Compliance's Trade Secrets and other confidential information all while Greene and McDonough planned and launched a directly competitive business, Legacy.

170. As a result, Defendants gained a head start on establishing a competing business without having to invest any real time and/or money to do so, to Harbor Compliance's detriment.

171. Further, Defendants have engaged in unfair and deceptive business practices by using Harbor Compliance's Confidential Information, whether or not it constitutes a trade secret, and by destroying Company files to deprive Harbor Compliance of them, in order to offer and market competing services on behalf of Legacy.

172. Defendants' conduct constitutes unfair competition under Pennsylvania law because it includes, among other things, the misappropriation of Harbor Compliance's Trade Secrets, as set forth in Counts I and II, and the unlawful use of Harbor Compliance's Confidential Information, in violation of the Agreements, the Employee Handbook, and Greene's and McDonough's duty of loyalty, as set forth above.

173. Defendants' conduct, as detailed above, was and is all intended to provide them with an unfair competitive advantage in the marketplace, and to interfere with the Company's business relationships by improper means.

174. Defendants' unfair professional and business practices have unjustly minimized Harbor Compliance's competitive advantage, have harmed Harbor Compliance's commercial relations, including its relationships with its existing and prospective clients, and have caused and continue to cause Harbor Compliance to suffer damages.

175. As a direct and proximate result of Defendants' unfair professional and business practices, Harbor Compliance will continue to suffer irreparable injury, for which Harbor Compliance has no adequate remedy at law.

176. Due to Defendants' conduct, Harbor Compliance seeks damages in the form of Defendants' profits being disgorged and/or Defendants being required to restore any and all

revenues, earnings, profits, compensation, benefits, and rights of attribution that may have accrued to or been obtained by Defendants as a result of their unfair competition, including, but not limited to, returning any revenue earned from the unlawful and unfair use of Harbor Compliance's confidential information and/or Trade Secrets.

177. Defendants' conduct has been willful, outrageous, undertaken with reckless indifference to the rights of Harbor Compliance, in bad faith, and with the intent to harm Harbor Compliance.

## COUNT V
## CIVIL CONSPIRACY
## (*Harbor Compliance v. Defendants*)

178. Harbor Compliance incorporates the foregoing Paragraphs of this Complaint as though set forth at length herein.

179. Greene and McDonough conspired and agreed with one another, and later with and through Legacy, to take Harbor Compliance's Trade Secrets and Confidential Information, delete them from the Company's systems, and use them to compete against Harbor Compliance.

180. Defendants' agreement is documented in their own words: on June 12, 2026, Greene instructed McDonough to "[p]ut it in the personal gmail," confirmed that "we just keep everything personal" and, "when we go, we delete it all," and closed with *"ok totally confidential k??"*

181. McDonough assented to each step: she confirmed she had already put the spreadsheet in her personal Gmail, agreed to share it with Greene, responded "righ[t]" to the plan to "delete it all," and answered Greene's calls for secrecy with an affirmative "yeah."

182. In furtherance of that agreement, Defendants committed numerous overt acts, including: (i) forwarding Company files to their personal Gmail accounts; (ii) improperly downloading Company files and syncing them to a local device; (iii) deleting more than 1,400

Company files from Harbor Compliance's systems; (iv) coordinating their resignations on one day's notice; (v) forming Legacy on their last day of employment; and (vi) retaining the Retained Files after their departure.

183. Defendants acted with malice, with the specific intent to injure Harbor Compliance, and without any justification or privilege, as confirmed by McDonough's stated purpose of deleting the #UCC Filings spreadsheet "so Jo loses access to it," followed by "like for real eff her."

184. Defendants' conspiracy was carried out through unlawful acts, including misappropriation of trade secrets, breach of the duty of loyalty, and unfair competition, as set forth above.

185. As a direct and proximate result of Defendants' conspiracy, Harbor Compliance has suffered, and continues to suffer, damages and irreparable harm, and Defendants are jointly and severally liable for the same.

186. Defendants' conduct as aforesaid has been willful, outrageous, undertaken with reckless indifference to the rights of Harbor Compliance, in bad faith, and with the intent to harm Harbor Compliance, entitling Harbor Compliance to punitive damages.

## COUNT VI
## AIDING AND ABETTING BREACH OF THE DUTY OF LOYALTY
**(*Harbor Compliance v. Defendants*)**

187. Harbor Compliance incorporates the foregoing Paragraphs of this Complaint as though set forth at length herein.

188. As set forth in Count III, Greene and McDonough each breached the duty of loyalty that they owed to Harbor Compliance.

189. Each of Greene and McDonough knew that the other owed Harbor Compliance a duty of loyalty, and knew that the other's conduct breached that duty.

190. Rather than discourage one another, Greene and McDonough egged each other on, each knowingly providing substantial assistance and encouragement to the other's misappropriation of Harbor Compliance's Trade Secrets and the deletion of Company files, all to benefit their competing business, Legacy, including by: (i) Greene instructing McDonough, immediately after McDonough announced she had deleted the #UCC Filings spreadsheet "so Jo loses access to it," to "[p]ut it in the personal gmail"; (ii) McDonough confirming she had done so and agreeing to share the spreadsheet with Greene's personal Gmail account; (iii) Greene reinforcing their shared plan to "keep everything personal" and, "when we go, we delete it all," and urging McDonough to keep it "totally confidential"; (iv) Greene forwarding a customer's UCC-3 amendment to McDonough's personal Gmail account; (v) McDonough setting the timeline to work through August and quit in early September, after which Greene moved more than 1,300 Company files to the "trash"; (vi) repeatedly moving their communications off Company systems with instructions to "text me"; and (vii) coordinating their resignations and forming Legacy on their last day of employment.

191. Greene and McDonough would have been far less able to take and destroy Harbor Compliance's Trade Secrets and Company files without the other's encouragement, coordination, and participation, and each acted with the shared purpose of launching Legacy with Harbor Compliance's Trade Secrets in hand while depriving Harbor Compliance of its own files.

192. Upon information and belief, Legacy, which Greene and McDonough formed on their last day of employment, had knowledge of their breaches through its founders and members, and has knowingly accepted the benefits of, and substantially assisted, those breaches by serving as the vehicle through which Defendants compete with Harbor Compliance using its confidential information.

193. As a direct and proximate result of Defendants' aiding and abetting, Harbor Compliance has suffered, and continues to suffer, damages and irreparable harm.

194. Defendants' conduct as aforesaid has been willful, outrageous, undertaken with reckless indifference to the rights of Harbor Compliance, in bad faith, and with the intent to harm Harbor Compliance, entitling Harbor Compliance to punitive damages.

**COUNT VII**
**BREACH OF CONTRACT**
**(*Harbor Compliance v. Greene and McDonough*)**

195. Harbor Compliance incorporates the foregoing Paragraphs of this Complaint as though set forth at length herein.

196. The Agreements are valid and enforceable contracts, supported by adequate consideration, including Greene's and McDonough's employment with Harbor Compliance and their access to its Confidential Information.

197. Under Section 2 of the Agreements, Greene and McDonough each agreed "not to directly or indirectly use, divulge or disclose Confidential Information . . . for Employee's own benefit or for the benefit of any person other than Employer, either during or after Employee's employment." (Exs. A–B § 2.)

198. The Agreements define "Confidential Information" to include "any information or compilation of information that Employee may receive from Employer . . . which is generally not known," expressly including "trade secrets" and "information regarding the Employer's customers," and provide that these confidentiality obligations "are unconditional" and survive the termination of employment. (*Id.* §§ 1(a), 2(b), 10.)

199. The Retained Files, including the Customer Spreadsheet, as well as the other Company files and Trade Secrets that Greene and McDonough downloaded, synced, and

forwarded to their personal accounts and devices, constitute Confidential Information under the Agreements.

200. Greene and McDonough materially breached Section 2 of the Agreements by downloading and taking Harbor Compliance's Trade Secrets and Confidential Information for their own benefit and the benefit of their competing business, Legacy, including by, *inter alia*: (i) improperly downloading Company files containing Confidential Information and syncing them to a local device against Company policy; (ii) forwarding Trade Secrets and Confidential Information, including customer UCC documents, to their personal Gmail accounts; (iii) copying the #UCC Filings spreadsheet to a personal account; (iv) retaining the Retained Files, including the Customer Spreadsheet, after their employment ended while launching Legacy; and (v) usurping the Confidential Information and Trade Secrets to compete with Harbor Compliance through Legacy.

201. Harbor Compliance has performed all of its obligations under the Agreements.

202. As a direct and proximate result of Greene's and McDonough's breaches, Harbor Compliance has suffered, and will continue to suffer, damages and irreparable harm.

203. Indeed, Greene and McDonough expressly agreed that any such breach "will cause irreparable harm to Employer for which there is no adequate remedy at law," and that Harbor Compliance may obtain an injunction "without bond or surety." (*Id.* § 9.)

204. Greene and McDonough further agreed to pay the attorneys' fees and costs that Harbor Compliance incurs in enforcing the Agreements, and Harbor Compliance is entitled to recover those fees and costs. (*Id.* § 13.)

**WHEREFORE**, Harbor Compliance respectfully requests that this Honorable Court enter judgment in its favor and against Defendants, and Order the following relief:

a) A permanent injunction ordering that: (i) Greene and McDonough, and all other persons or entities acting in concert or participation with Greene and McDonough, be permanently enjoined and restrained from violating any provisions of the Agreements; (ii) for a period of two (2) years from the date on which Greene and McDonough resigned from Harbor Compliance, Defendants, and all other persons or entities acting in active concert or participation with Defendants, be permanently enjoined and restrained from accepting business from any of the Harbor Compliance customers identified in the Customer Spreadsheet; (iii) for the life of each of the Trade Secrets, which shall be determined at trial, Defendants, and all other persons or entities acting in active concert or participation with Defendants, be permanently enjoined and restrained from possessing, using, copying, and/or disclosing any Trade Secrets belonging to Harbor Compliance, including, but not limited to, for the purpose of conducting any business on behalf of and/or through Legacy; (iv) Defendants return to Harbor Compliance any and all files and materials that contain any Trade Secrets belonging to Harbor Compliance that are within their possession, custody, and/or control; and (v) Defendants, at their own cost, submit to forensic destruction of any wrongfully obtained Trade Secret information belonging to Harbor Compliance following the disposition of this case.

b) Compensatory damages, including without limitation lost profits and all damages resulting from Defendants' breaches of their statutory and common law obligations;

c) An accounting and equitable disgorgement for payment to Harbor Compliance of all profits and earnings of Defendants resulting from their misconduct;

d) Statutory and exemplary damages for violation of the DTSA and PUTSA;

e) Attorneys' fees and costs as provided under the DTSA, the PUTSA, and Section 13 of the Agreements;

f) Punitive damages against Defendants; and

g) Such other or further relief as the Court may determine is necessary to provide complete relief for Harbor Compliance resulting from Defendants' violations of law.

**JURY TRIAL DEMANDED**

Harbor Compliance respectfully requests a trial by jury on all claims so triable.

Respectfully submitted,

**ROYER COOPER COHEN BRAUNFELD LLC**

Dated: November 11, 2026

By: */s/Marc B. Cytryn*

Marc B. Cytryn, Esquire (No. 320958)
Aislinn E. Sroczynski, Esquire (No. 330330)
Three Logan Square
1717 Arch Street
Suite 4700
Philadelphia, PA 19103
484-362-2620 (phone)
484-362-2630 (fax)
mcytryn@rccblaw.com
asroczynski@rccblaw.com

*Attorneys for Plaintiff, Harbor Compliance LLC*